STATE, EX REL. WALTER LOSEKE, RELATOR, V. CHARLES B. FRICKE ET AL., RESPONDENTS.

FILED APRIL 14, 1934. No. 29193.

*Perry, Van Pelt & Marti,* for relator.

*C. N. McElfresh, Mullen, Mullen, Shea & Massey* and *August Wagner,* for respondents.

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and REDICK, District Judge.

GOOD, J.

This is an action in *quo warranto* and originated in this court.

Relator is a landowner within the corporate limits of the Loup River Public Power District. His land will be affected by the contemplated construction by the district of a hydro-electric power plant and irrigation works. He brings this action against respondents, alleging that they are serving and acting as directors and officers of the corporation without power and authority so to do. Relator bases his claim for relief on the ground that chap-

ter 86, Laws 1933, pursuant to the provisions of which the Loup River Public Power District was organized, is void because violative in many respects of both the state and federal Constitutions. Respondents answered, admitting certain allegations of the petition and denying others, and pleaded new matter which need not be now considered. Thereupon, on motion of relator, the cause was submitted on the pleadings. We can consider only such facts as are admitted by the pleadings.

It is urged that chapter 86, Laws 1933, was not passed by both houses of the legislature, and therefore never became a law. Specifically it is contended that the bill originated in the senate, was passed by that body and sent to the house; that the latter body amended the bill in several respects and returned it to the senate. It is contended that the senate did not concur in all the amendments made by the house, and that the amendments made in the house were an inducement to its passage in that body. A certified copy of the original enrolled bill is in the record. The enrolled bill is signed by the president and secretary of the senate, by the speaker and chief clerk of the house, and approved by the governor. The bill, so certified, imports verity and its passage can only be overthrown by the journals of the house or senate showing affirmatively that the bill was not passed in the manner prescribed by the Constitution.

An examination of the journals of the senate shows that the bill was passed by that body in a proper manner, sent to the house of representatives, and that it was there amended in several respects; that the bill, as amended, was then returned to the senate, and the senate journal shows that the "amendment" was regularly concurred in. It is the contention of relator that, since the bill was amended in several respects, it was necessary that the record should show the *amendments* were concurred in. We are unable to accept this view.

In *Follmer v. State,* 94 Neb. 217, it was held: "The singular number often includes the plural in the construc-

tion of statutes, and generally when the manifest intention of the legislature requires it."

It further appears that, when the house transmitted to the senate the bill, after it had been amended, it purported to carry the several amendments made by the house. An amendment to a statute or a bill may be in more than one particular but still be but one amendment. The legislature has frequently, by a single act, amended a statute in several particulars, and sometimes several sections of an existing statute have been amended by a single legislative act. From the fact that the bill, as certified by the president and secretary of the senate, contains all the amendments that were made by the house, we are convinced that all of the alterations or changes in the bill which were made by the house were concurred in by the senate. The record fails to show that chapter 86, Laws 1933, was not regularly passed by each branch of the legislature.

Relator argues that the title to chapter 86 contains more than one subject, in violation of section 14, art. III of the Constitution. The title to the act is too lengthy to be included in this opinion. It is in part as follows: "An act relating to irrigation, flood control, storage of waters of natural streams, and matters incident thereto, and, either separately or in connection therewith, the generation, distribution, transmission, sale and purchase of electrical energy for lighting, power, heating and other purposes;" and goes on to provide in detail the methods by which the general purpose may be carried out. Relator contends there are 26 different subjects in the bill, but we are of the opinion that all of them are so related as to be a part of one general subject. Generally speaking, it relates to the preservation and utilization, for the public welfare, of one of the natural resources of the state, to wit, the waters of its streams and rivers. This is a broad subject and includes all practical uses and benefits of which such waters are susceptible, not only for irrigation, but canals for transportation, dams for power and

production of electricity for purposes of light and power. The title is probably more of a synopsis of the act than is essential. Because the title to a legislative act details the manner in which granted powers may be exercised does not make it duplicitous when the details are germane to the one general subject.

Relator contends that chapter 86, Laws 1933, is void because sections 12 and 13 thereof are in conflict with each other, and one of said sections nullifies the other. Sections 13 authorizes and directs the board of directors of the district to establish and collect rates and charges for any service rendered or commodity furnished or sold, and that such rates shall be fair, reasonable and non-discriminatory, and further provides: "The governing body of the district shall never lease or alienate the franchises, plant- and/or physical equipment of the district to any private person, firm, association or corporation for operating or any other purpose." Section 12 provides: "No power plant, system, or irrigation works owned by the district shall be sold, alienated or mortgaged by the district, except under the following circumstances, to wit: If, in order to borrow money from the federal government or from any loan or finance corporation or agency established under federal law, including the Reconstruction Finance Corporation, or its successor, it shall become necessary that the district mortgage or otherwise hypothecate any or all its said property or assets to secure the payment of a loan or loans made to it by or from such source or sources, the district is hereby authorized and empowered to do so. Nothing in this section contained shall prevent the district from assigning, pledging, or otherwise hypothecating its revenues, incomes, receipts or profits to secure the payment of indebtedness to the federal government."

Relator contends that the provisions of said section 13 deny the power to the district to lease or alienate its franchise, plant or physical equipment, and that section 12 empowers the district to mortgage or hypothecate its

property and assets to secure a loan from the federal government or some of the loan or finance corporations established under federal law; that if such mortgage be given it could only be enforced by foreclosure, which would necessitate a sale of the property, so that it might go into the hands of a private person or corporation.

We think that relator has not properly interpreted said section 13. That section only prevents the leasing or alienating of the franchise, plant or physical property of the district to a private person, firm, association or corporation; while section 12 authorizes the mortgaging of the plant to the federal government or one of its financial agencies. What is sought by section 13 is to prevent the district from surrendering or turning over its property directly to a private individual, firm, association or corporation, and nothing further in that respect; while section 12 specifically authorizes the mortgaging of the plant to the federal government, or one of its financial agencies, which is a public agency and not a private corporation. What would result, in the event the district should mortgage its plant, default in the conditions of the mortgage and a foreclosure follow, and whether the plant could be sold and title given to a private individual or corporation, is a question that is not now before us and presents a contingency that may never arise. In any event, the contingency is so remote that it need not be considered. But, even if the plant and property of the district should go into the hands of a private individual or corporation by virtue of judicial sale, still that would not be prohibited by the act. It is only direct action by the district of leasing or alienating its plant, etc., to a private person, individual, firm or corporation that is prohibited. We think there is no serious conflict between the two sections.

It is further argued that no power or method is provided for requiring the district to establish and collect adequate rates for any commodity it may sell or service it may furnish, and that serious difficulties may arise in

that the district may be unable to collect adequate rates to pay any bonded indebtedness which it may create. These matters may have a tendency to affect the market for any bonds that may be issued and secured by a mortgage upon the plant, but that does not affect the validity of the act. It goes to the wisdom of the legislation. With that the court has no concern. Whether the legislature is wise or unwise; whether the enterprise may be profitable or unprofitable, was a matter for the consideration of the legislature, and evidently the legislature deemed the legislation proper.

It is further contended by relator that chapter 86 is violative of both the federal and state Constitutions, in that it provides for taking of private property without paying just compensation therefor. Again, we are unable to agree with relator. Section 7 of the act confers upon the district the power of eminent domain after the manner provided for in sections 46-602, 46-603, 46-608, and 46-617, Comp. St. 1929. These sections provide for the method of exercise of the power of eminent domain for irrigation purposes, and these sections, in turn, refer to the sections conferring on railroad companies the right to exercise the power of eminent domain and the manner of its exercise.

It is apparent, by reference to the sections referred to, that the property of no person may be taken by the district for public purposes until the amount of damage which he has sustained or will sustain by the taking of his property has been ascertained and paid into the county court. The contention that private property may be taken by the district for public use, without just compensation, seems to be wholly unfounded.

It is further argued that the district has no funds at its command with which to pay for property condemned. That does not render the act unconstitutional. It would be necessary for the district to acquire the funds to pay for property condemned, in the event that it becomes necessary for it to resort to condemnation. This court

is not concerned with the difficulties that the district may encounter in obtaining the funds with which to finance construction of its proposed plant. Since relator and others similarly situated are fully protected in their private property and are assured that it may not be taken from them, except upon payment of just compensation, neither relator nor any one similarly situated has cause to complain.

, Relator further contends that there is no provision for him, or for those similarly situated, to have their day in court, if and when condemnation proceedings are instituted. This contention is unfounded. The applicable statute, authorizing the exercise of the power of eminent domain, provides for the filing of a petition in the county court, the appointment of disinterested appraisers, and ten days' notice, in writing, of the time and place of the assessment of damages, and if the owner be dissatisfied with the award he is permitted an appeal to the district court where the cause may be heard before a jury. The statute is apparently not vulnerable to the charge that the property owner is denied due process of law.

Relator also charges that the district is without power to function unless a grant is issued by the department of roads and irrigation, permitting the diversion and use of sufficient water for said purposes. If the district has not yet obtained a grant from the department of roads and irrigation, and if such grant is necessary, that is the concern of the district, but does not, as we view it, concern the relator. If such grant is necessary, there is no reason why the district may not yet procure the grant, but, in any event, that cannot prejudice the relator in his right to the protection of his property.

Chapter 86 is assailed because it permits the district to come into competition with municipally and privately owned and operated electric light and power plants, and, by such competition, may render such privately and municipally owned plants valueless, to the great injury of the owners. This goes only to the wisdom of the legis-

lation, and not to its validity. That was a matter solely for the legislature to determine. Its action in that respect is not subject to review by this court.

From a consideration of the entire record, we conclude that relator is not entitled to the relief demanded.

Relator's motion for judgment in his favor on the pleadings is denied and the cause dismissed at relator's cost.

DISMISSED.